**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180477-U

Order filed December 22, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal Nos. 3-18-0477 and 3-18-0478 Circuit Nos. 13-CF-1435 and 13-CF-2252 |
| DWIGHT E. MUSSON, | ) ) ) | Honorable David Martin Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Schmidt and Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    (1) The record was insufficient to review defendant's claim that the State presented misleading evidence to the grand juries, and defendant's claim that the evidence presented to the grand juries was insufficient to support a finding of probable cause was improper. (2) The evidence was sufficient to prove defendant guilty beyond a reasonable doubt of unlawful delivery of a controlled substance and drug-induced homicide. (3) Any error in the court's admission of other-crimes evidence was harmless.

¶ 2    Defendant, Dwight E. Musson, appeals his convictions for unlawful delivery of a

controlled substance and drug-induced homicide. Defendant argues that (1) the Will County

circuit court erred in denying his motion to dismiss the bills of indictment, (2) the evidence was insufficient to prove him guilty of the offenses beyond a reasonable doubt, and (3) the court abused its discretion in admitting evidence of other crimes. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On June 28, 2013, defendant was charged by indictment with unlawful delivery of a controlled substance (720 ILCS 570/401(d)(i) (West 2012)) in that he "knowingly and unlawfully delivered a substance containing heroin, a controlled substance, other than as authorized in the [Illinois] Controlled Substances Act [(Act) (*id.* § 100 *et seq.*)]." Defendant was also charged with unlawful possession of a controlled substance (*id.* § 402(c)), but this charge was dismissed prior to trial. The charges were filed in Will County case No. 13-CF-1435.

¶ 5        On October 17, 2013, defendant was charged by indictment with drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2012)) in that he "knowingly and unlawfully deliver[ed] heroin, a controlled substance, to Rebecca Sova, and Rebecca Sova thereafter ingested a portion of said heroin into her body, and said ingestion of heroin caused the death of Rebecca Sova." This charge was filed in Will County case No. 13-CF-2252.

¶ 6                        A. Motion to Dismiss the Bills of Indictment

¶ 7        Defendant filed a motion to dismiss both bills of indictment. Defendant alleged that at both grand jury proceedings, Officer Jason Barten gave misleading testimony, and, as a result, the bills of indictment violated defendant's right to due process. Specifically, defendant alleged that Barten "allow[ed] the members of the Grand Jury to falsely believe that the Defendant went alone and purchase[d] the drugs," which caused the grand juries to return the bills of indictment. Defendant also argued that the testimony presented to the grand juries did not provide probable

2

cause to believe that the charged offenses had been committed. Defendant purported to quote from the transcript of the grand jury proceedings in his motion.

¶ 8    Several hearings were held on defendant's motion to dismiss the bills of indictment. Over the course of the hearings, the court admitted into evidence a video recording of defendant's interview with Detective Shawn Filipiak, a video recording of defendant's interview with Barten, transcripts of each interview, and transcripts of the grand jury proceedings. Neither the recording of defendant's interview with Barten nor the transcripts of the grand jury proceedings are contained in the record on appeal.

¶ 9    At one of the hearings on defendant's motion to dismiss the indictments, Barten testified that he was one of the primary investigators on this case. Barten acknowledged that he testified before the first grand jury that defendant had stated that he gave the heroin to Sova after he purchased it. Barten testified that he believed that defendant said this during one of his videotaped statements. If such statements were not in the videos, they would not be anywhere else. Barten also testified that he received a forensic report of defendant's cell phone on July 9, 2013, which contained records of text messages. He was aware of the content of these text messages when he testified before the second grand jury, but he was not aware of it at the time he testified before the first grand jury.

¶ 10    Defense counsel argued that Barten's testimony before both grand juries was inaccurate and misleading because nothing in defendant's interview with the police indicated that he purchased the heroin and then gave it to Sova. Defense counsel asserted that defendant stated in his interviews that he and Sova purchased the heroin together. Defense counsel argued that even the text messages did not support Barten's representations to the second grand jury that defendant purchased the heroin and gave it to Sova.

¶ 11       The court denied the motion to dismiss as it related to the bill of indictment for drug-induced homicide, which was returned by the second grand jury. The court took the matter under advisement as it related to the bill of indictment for unlawful delivery of a controlled substance. The matter was continued to August 31, 2015. A docket entry indicates that the motion to dismiss was denied at that time. However, the record does not contain a written order or the transcript of the proceedings on August 31.[1]

¶ 12       B. Pretrial Motions Concerning Other-Crimes Evidence

¶ 13       Defendant filed a motion *in limine* to exclude evidence that he had used or sold illegal drugs on prior occasions. Defendant argued that this evidence was inadmissible to show his propensity to commit a crime and that the probative value of the evidence would be substantially outweighed by the danger of unfair prejudice.

¶ 14       The State filed a motion to admit evidence of other crimes. The motion stated that the State planned to introduce evidence that defendant regularly sold heroin to Barry Burd, his coworker. The State indicated that this evidence would be introduced to show defendant's intent to deliver heroin to Sova.

¶ 15       The court ultimately ruled that it would allow Burd to testify regarding prior heroin transactions with defendant. The court reasoned that "if it goes to one of the elements the State has to prove, they are allowed to get into it."

¶ 16       C. Trial

---

[1] In his reply brief, defendant contends that the court's denial of his motion to dismiss was contained in the transcripts he provided. However, defendant cited to a portion of the transcript in which the court denied his motion to dismiss based on his argument that the State failed to give the applicable law to the grand jury. Defendant does not reassert this argument on appeal. The record does not contain a transcript of the court's denial of defendant's motion to dismiss the indictment charging him with unlawful delivery of a controlled substance on the basis that Barten provided inaccurate testimony before the grand jury.

4

¶ 17    The matter proceeded to a bench trial. Sandra Kovalcik, Sova's mother, testified that she saw Sova on June 27, 2013. She saw Sova at the hospital the next day after receiving a call from defendant. Defendant said that he was Sova's friend and that Sova had overdosed on heroin. Sova died on July 2, 2013.

¶ 18    Detective Filipiak interviewed defendant on June 29, 2013, after defendant had agreed to accompany several detectives to the police station. Filipiak knew Sova's father, a retired police officer, before working on the case. An audio and video recording of Filipiak's interview with defendant was admitted into evidence and played in open court. In the recording, defendant stated that he had been in a sexual relationship with Sova for approximately a month and a half. On June 27, 2013, defendant and Sova met at a gas station between 8 and 9 p.m. They went to some friends' houses. They then went to defendant's residence and used heroin together.

¶ 19    Sova's money was used to purchase the heroin, and defendant had the connection. The detectives asked defendant: "How many grams did you buy? How much money's worth?" Defendant replied, "One hundred dollars' worth." Filipiak asked: "You purchased it and then you guys got high together and do you believe that is about right? Is that all correct?" Defendant replied, "Yeah." Filipiak asked, "Did [Sova] go with you when you purchased it? Did she drive and you were the passenger?" Defendant replied, "Yeah." Filipiak asked defendant if Sova handed him money to purchase the heroin, and defendant nodded his head. Filipiak asked: "Okay. And then you went up and purchased it from your source?" Defendant nodded his head. Filipiak asked, "A hundred dollars' worth of heroin?" Defendant nodded his head.[2] Filipiak

---

[2]A transcript of the interview prepared by the defense, which was introduced at trial as a demonstrative exhibit, does not indicate that defendant nodded his head when Filipiak asked defendant if he went up and purchased the heroin from his source and whether it was one-hundred dollars' worth of heroin. However, the video recording shows that defendant nodded his head, indicating "yes," after each of these questions was asked.

asked, "Is it one bag or multiple bags?" Defendant replied, "Multiple bags." Defendant said that there were a total of six bags. They went to a friend's house and then went to defendant's residence. They started using the heroin when they got to defendant's residence.

¶ 20    Defendant went to sleep at approximately 6:30 a.m. Sova lay down next to him. Defendant woke up at 7:40 a.m. Sova was still sleeping. She was lying on defendant, and he rolled her off of him. She made a gurgling noise. Defendant went to work. Defendant called Sova multiple times, but she did not answer. Defendant remembered the gurgling noise and became concerned that something was wrong. Defendant checked on Sova during his lunch break. She was still lying on the same spot on the bed. Her lips were blue. She was breathing and gurgling a little bit. Defendant drove Sova to the hospital. He stayed at the hospital for approximately 45 minutes to 1 hour. Defendant called Sova's mother and left.

¶ 21    Burd testified that he had been granted immunity from prosecution for the offenses of possession of controlled substances and delivery of controlled substances from 2013 if he testified truthfully and consistently with his prior statements to the police. Burd previously worked with defendant at a bar. In June 2013, Burd was using heroin. He purchased heroin from defendant approximately every two to three days. Sometimes defendant brought the heroin to work. Other times, Burd picked it up from his house or across the street from the Jiffy Lube where defendant also worked.

¶ 22    On June 28, 2013, at approximately 9 to 10 a.m., defendant called Burd and asked him to go to his house to check on Sova. Defendant told Burd that Sova was not awake when he left the house, and she was not answering her phone. Defendant said that they had been "up partying all night." Burd got dressed, used heroin, and went to defendant's residence. He arrived approximately 30 minutes later. Burd found Sova lying in a bed. She would not wake up. Burd

6

lifted her arm, and she seemed stiff and cold. He put his finger on her neck to check for a pulse, but he could not find one. Sova was cold to the touch and had blue lips. Burd told defendant that he could not find a pulse and that he would call 911. Defendant said he would take care of it. Burd did not call 911 because he was afraid. He left the residence.

¶ 23    Barten testified concerning security camera footage from the hospital. The footage showed defendant pull up to the hospital in his father's pickup truck. Sova was taken out of the passenger seat and placed in a wheelchair. The security camera footage was played in court. A video recording of defendant's interview at the Shorewood Police Department was also played.[3] Neither the security camera footage nor the recording of the interview is included in the record on appeal.

¶ 24    Officer Daniel Tischina testified that he recovered a video from the gas station where defendant and Sova met on June 27, 2013, at approximately 9:25 p.m. Tischina testified that in the video, Sova could be seen by her vehicle at the gasoline pump. She then drove the vehicle to an area with no security cameras. A white truck with a decal on it, which appeared similar to the truck defendant drove to the hospital, pulled up to the gas station. The white truck exited the gas station parking lot, and Sova's vehicle followed it. The security camera footage was admitted into evidence, but it is not contained in the record on appeal.

¶ 25    Pursuant to stipulation, an ATM receipt showing a withdrawal of $100 on June 27, 2013, at 10:20 p.m. was admitted into evidence. Sova's father gave the receipt to the police, and it was presumed to be Sova's ATM receipt.

---

[3]Only Barten's testimony on redirect examination and recross-examination appear in the record. This testimony occurred during the afternoon session on October 4, 2017. It appears that there was a morning session of the trial on October 4, but no transcript for this session appears in the record.

¶ 26    Dr. Peter Stockmal testified as an expert witness in the field of emergency medicine. Stockmal testified that he treated Sova in the ER on June 28, 2013. Sova was unconscious and not breathing well. The providers in the ER gave her Narcan, which would revive someone who had recently overdosed on narcotics. Sova did not respond to the Narcan. Stockmal said that by the time Sova was brought to the hospital, the initial effect of the heroin may have worn off and she may have been suffering from encephalopathy from not breathing. In that situation, Narcan would not have had much effect.

¶ 27    Stockmal testified that his notes indicated the male who brought Sova to the ER reported that she had been snorting heroin at 6 a.m. that morning. Sova's urine was tested for the presence of drugs. It was positive for opiates, barbiturates, and cocaine. Her blood was tested for aspirin, Tylenol, and alcohol. All the blood tests were negative. Sova's pupils were dilated symmetrically and were reactive to light. In the event of a fresh heroin overdose, a patient's pupils would be constricted. However, there were several hours between Sova's ingestion of heroin and her treatment in the ER, which could have allowed for the pupils to no longer be constricted.

¶ 28    Sova was transferred to the intensive care unit (ICU), where her treatment was managed by other doctors. At the time Sova was transferred to the ICU, Stockmal had diagnosed her with heroin overdose, respiratory failure, question early rhabdomyolysis with renal insufficiency, mild hyperkalemia, and toxic/anoxic encephalopathy. Stockmal testified that rhabdomyolysis was a muscle injury. He stated that Sova's creatine kinase (CK) was elevated, which can be caused by a muscle injury or being in a still position without moving. Stockmal testified that the encephalopathy diagnosis meant that Sova's brain was not functioning. Stockmal acknowledged that Sova was positive for cocaine as well as heroin.

8

¶ 29        Officer Daniel Koopman testified that he and three other officers executed a search warrant on the residence where defendant indicated that he and Sova had used heroin prior to her hospital admission. Koopman searched a bedroom at the residence. Koopman saw a white powdery substance and a business card with a similar white powdery substance on it on top of a dresser. Koopman also observed a similar white powder on a blanket. Koopman also saw a "corner cut baggy." Pursuant to stipulation, the white powder on the blanket was tested and found to contain cocaine. None of the other items were tested.

¶ 30        Larry Shelton, a forensic scientist at the crime laboratory, was accepted as an expert witness in forensic science in the field of toxicology.[4] Shelton testified that he received samples of blood and urine in connection with the instant case to be tested for drugs. The testing began on July 23, 2013. The testing was "geared toward the cocaine and the opiates" because of the limited sample that was available. A preliminary test showed positive results for barbiturates, opiates, and cocaine. A confirmatory test on the urine showed the presence of 6-Monoacetylmorphine (6-MAM), codeine, morphine, and naloxone. Shelton testified that 6-MAM was a metabolite of heroin. Shelton then performed quantitative testing on the blood. The testing did not detect cocaine, but it detected benzoylecgonine, the major metabolite of cocaine, at a level of 630 micrograms per liter. Codeine was detected at a level of less than 10 micrograms per liter, and morphine was detected at a level of less than 50 micrograms per liter.

¶ 31        For the morphine test, the samples were diluted. Three tests were run on three different levels of dilution. Each test returned a result of approximately 30 micrograms per liter. Because the response that the testing instrument gave for all the dilutions was below the lowest calibrator

_____

[4]Shelton referred to his place of employment as the "Illinois State Police Forensic Sciences Command." However, for the sake of consistency, we refer to it as the "crime laboratory" throughout this order.

used in the calibration curve, the tester could not be as sure about the accuracy of the result. Accordingly, the results were reported as less than 50 micrograms per liter rather than the specific numbers. Thirty to fifty micrograms per liter was a therapeutic level of morphine.

¶ 32    Daniel Isenschmid, a forensic toxicologist at NMS Laboratories, testified as an expert witness in the field of toxicology. In January 2017, NMS Laboratories received two vials of Sova's blood. The blood had been drawn on June 28, 2013, and it had been stored at room temperature. Isenschmid said that there were a lot of limitations to using such a sample, as "things are going to start breaking down." Isenschmid also noted that some drugs were less stable than other drugs, "[s]o there may be some loss."

¶ 33    Before testing the sample, Isenschmid indicated to the police that the sample "quite possibly could be goopy" due to its age. "Goopy" meant a "very thick, mucousy sample." Such a sample may not be testable. When the sample of Sova's blood arrived at NMS Laboratories, employees determined that it could still be tested but the quantitative numbers were likely unreliable. Isenschmid stated that he did not describe the sample he actually received as "goop."

¶ 34    NMS Laboratories ran an "expanded postmortem drug screen," which tested for approximately 230 therapeutic drugs. The testing revealed positive findings for morphine, codeine, diphenhydramine (or Benadryl), caffeine, cotinine (a nicotine metabolite), MEGX (a lidocaine metabolite), and naloxone.

¶ 35    NMS Laboratories also ran a second confirmatory test for morphine, codeine, diphenhydramine, and barbiturates. The confirmatory test revealed morphine at 97 nanograms per milliliter, codeine at less than 5 nanograms per milliliter, and diphenhydramine at 55 nanograms per milliliter. Isenschmid testified that nanograms per milliliter was the "same thing" as micrograms per liter. Isenschmid stated that the morphine concentration and the small amount

10

of codeine in Sova's blood indicated that the morphine probably came from the ingestion of heroin. Diphenhydramine was frequently used as a cutting agent with heroin. The confirmatory test revealed a very small amount of butalbital, a barbiturate, but it was below the reporting limits. Isenschmid stated that the positive result for MEGX was an incidental finding and was not quantitated. MEGX came from lidocaine, which was frequently used in hospitals. Lidocaine was also a cutting agent of cocaine, heroin, and other drugs.

¶ 36        Isenschmid indicated that the positive findings of the testing were accurate, but he "wouldn't put too much weight on the actual number[s]" due to the age of the sample and its storage conditions. Isenschmid stated that the testing done at the crime laboratory was more reliable. Isenschmid also stated that there may have been other drugs in the blood that had broken down over time and could not be detected by NMS Laboratories. Isenschmid noted that benzoylecgonine, a breakdown product of cocaine, was found by the crime laboratory when it previously tested the blood. NMS Laboratories was not able to detect benzoylecgonine, and this was likely due to the age of the sample.

¶ 37        Defense counsel asked Isenschmid what level of morphine was toxic. Isenschmid replied:

> "That's going to vary very, very much in different individuals. It's a drug when given by itself as morphine produces a fair amount of tolerance. So somebody that's been on it for a long time, like for cancer, could tolerate very high amounts; versus somebody who has not used it before, a toxic amount could be as low as 20, 30, 40 nanograms per milliliter. It depends."

¶ 38        Dr. Michel Humilier testified as an expert witness in the field of forensic pathology. Humilier performed an autopsy on Sova on July 2, 2013. Sova's lungs revealed edema, which was consistent with having been on a respirator for several days. It could also be caused by

11

heroin or opiate use. Sova's heart was slightly heavy. Her liver, spleen, and kidneys were congested, which were normal findings with the heart stopping. Sova's brain showed edema, or excess fluid, which can occur with a lack of oxygen to the brain. The brain also showed diffuse softening, which was consistent with Sova having been on artificial respiration for several days. The use of opiates was also a possible cause for cerebral edema.

¶ 39    Humilier testified that the crime laboratory reported that urine collected from Sova at the hospital was positive for 6-MAM, the first metabolite of heroin. After heroin was converted to 6-MAM, it then converted to morphine. The presence of 6-MAM conclusively indicated that heroin was present in Sova's system. According to the report from NMS Laboratories, the blood collected from Sova at the hospital was positive for morphine in the concentration of 97 nanograms per milliliter. The prior report from the crime laboratory indicated that there was morphine in Sova's blood in the concentration of less than 50 micrograms per liter. That level of morphine would be very low in a hospital setting. However, the morphine level in Sova was caused by an illicit drug and was not administered under the supervision of a physician. Accordingly, "any amount is considered a problem."

¶ 40    The crime laboratory reported that benzoylecgonine, the first metabolite of cocaine, was present in Sova's blood at the concentration of 630 micrograms per liter. Humilier could not determine from the autopsy whether Sova had consumed heroin or cocaine last.

¶ 41    Humilier's initial opinion was that Sova had died of anoxic encephalopathy due to "combined drug intoxication." Humilier explained that the crime laboratory had only tested for cocaine and opiates, so he said that Sova died from combined drug intoxication to "cover anything else that may have been missed," like alcohol or fentanyl. Humilier had asked the chief

12

deputy coroner if there were any other specimens available for testing, and the chief deputy coroner said that, to his knowledge, there were not.

¶ 42　　　In January 2017, Humilier learned through conversations with the prosecutors that there were additional specimens. These specimens were sent to NMS Laboratories, and an expanded panel, which tested for much more than just cocaine and opiates, was performed. The specimens had not been stored properly, and the earlier testing was likely more reliable. However, the testing at NMS Laboratories "ruled out the presence of other substances to the extent that it could with the date of the sample so that we could focus the cause of death as being strictly heroin and cocaine intoxication." Humilier's amended opinion, within a reasonable degree of medical and scientific certainty, was that Sova's cause of death was anoxic encephalopathy due to heroin and cocaine intoxication.

¶ 43　　　On cross-examination, the following exchange occurred between defense counsel and Humilier:

"Q. All right. And so then is it fair to say that you—originally your opinion was a combination of cocaine and heroin?

A. Yes.

Q. Okay. Based upon those two results?

A. That's correct.

Q. The—what you got from the crime lab, less than 50 MCGLL for the morphine and the 630 MCG over L for the cocaine?

A. And the 6-MAM."

13

¶ 44      Humilier could not say within a reasonable degree of medical certainty that the effect of the heroin, by itself, caused Sova's death. The following exchange occurred between Humilier and defense counsel:

"Q. So you cannot say to a reasonable degree of medical certainty that the death would not have occurred in the absence of the heroin?

A. That's correct.

Q. And you cannot say to a reasonable degree of medical certainty that the heroin was a but[-]for cause of death?

A. I don't understand what that means.

Q. That she wouldn't have died had it not been for the heroin.

A. That's correct.

Q. So your opinion is, if I rephrase it, that the heroin and the cocaine contributed to [Sova's] death? The both, the heroin and the cocaine—

A. Yes, that's correct.

Q:—contributed?

A: That's correct."

¶ 45      On redirect examination, the following exchange occurred between the prosecutor and Humilier:

"Q. Okay. So in your opinion *** the cause of death of Rebecca Sova was the anoxic encephalopathy due to heroin and cocaine intoxication; is that correct?

A. That's correct.

14

Q. So maybe this was a game of semantics, sir, but when you were asked by counsel \*\*\* whether the cocaine and heroin contributed to the death, are you assuming that contributing and cause is one in the same or can you elaborate on that for us, please?

A. I mean that the cause of death is due to the combination of her having heroin and cocaine in her system."

¶ 46 Records of text messages exchanged by defendant and Sova were also introduced into evidence. The records showed that defendant sent Sova a text message at approximately 7:30 p.m. on June 27, 2013, asking if she wanted to "hang out" at a friend's house later and saying that he was doing lines of "H" by himself. Sova asked why defendant was not sharing, and defendant said he had no one to share with. At approximately 7:44 p.m., Sova said: "Save some for me I just got off work." At approximately 8 p.m., defendant said that he had no money, and he was going to hang out with his friends because he did not want to just sit at home. Sova said that she had money. At approximately 8:11 p.m., defendant said: "Come on I'm drinking and driving and have dope in the truck." They arranged to meet at a gas station. At approximately 8:28 p.m., Sova indicated that she had arrived at the gas station.

¶ 47 Records of text messages that defendant exchanged with someone named Sarah on June 29, 2013, were also admitted into evidence. Defendant asked Sarah if he could come to her house because the police were looking for him. Defendant told Sarah he was facing a possible manslaughter charge because he was with someone who overdosed. Sarah asked, "How is it your fault though?" Defendant replied, "Cause I was the one who got it for her." Defendant then stated, "It's in our last text messages." Sarah asked, "And can[']t you say you refused to get her

15

the drugs and she got them somewhere else?" Defendant replied, "And I've been telling the cops and her parents that she brought it over that I didn't get it for her but the text say [*sic*] different."

¶ 48        The State rested.

¶ 49        Dr. Gregory S. Retzinger, a clinical pathologist, testified as an expert witness for the defense. Retzinger was hired by defense counsel to review medical records and render opinions. Retzinger reviewed hospital records, including laboratory reports and patient reports, concerning Sova. He also reviewed records from the crime laboratory and NMS Laboratories, as well as the testimony of Dr. Stockmal, Dr. Humilier, Shelton, and Isenschmid.

¶ 50        Retzinger testified that he reviewed the records on certain test levels of troponin and "CK-MB." The results indicated that Sova had suffered a "heart-related event" between 6 and 8 a.m. on June 28, 2013. Retzinger stated that significant cardiac events occur frequently when people take high doses of cocaine. The heart does not pump appropriately, blood does not get to the organs, tissues downstream die, and "[s]tuff backs up." A high dose of opioids would not cause such a condition. Sova's autopsy revealed that her heart was slightly enlarged, which could have been caused by a cardiac event or from fluid being retained in the heart tissue. Retzinger noted that no microscopic examination of the heart was performed at the autopsy.

¶ 51        The crime laboratory results showed that Sova had an elevated level of benzoylecgonine, a cocaine metabolite. Based on Retzinger's knowledge of the half-life of cocaine, how the body deals with cocaine, and the stability of the sample once the blood is drawn, Retzinger opined that Sova's cocaine level would have been as least 3000 micrograms per liter at 7 a.m. on June 28, 2013. This would have been a lethal amount of cocaine.

¶ 52        The crime laboratory results showed that Sova had less than 50 nanograms per milliliter of morphine in her blood. In an otherwise ambulatory patient, a therapeutic level of morphine is

16

up to 100 nanograms per milliliter. Given the age of the sample when it was tested, the level of morphine presumably derived from heroin would not have exceeded the therapeutic range for an otherwise ambulatory patient at 7:40 a.m. on June 28, 2013. Retzinger testified that the literature said "something to the effect of greater than 200 nanogram[s] per mill[iliter]" of heroin is a lethal amount. The amount of heroin required to kill an individual varied depending on other potential comorbidities. Also, a person who had been using heroin for an extended period of time might have a greater tolerance. Retzinger had no information about how often Sova used heroin.

¶ 53    Retzinger opined that Sova's anoxic encephalopathy was caused by a cardiopulmonary event due to her ingestion of cocaine. Retzinger opined, within a reasonable degree of medical or scientific certainty, that the heroin or morphine in Sova's system had nothing to do with her death. Retzinger stated that Sova's pupils were dilated and reactive when she was admitted to the hospital, which was consistent with cocaine intoxication. A person on heroin would have constricted pupils that did not react well to light. Even if several hours had passed after Sova ingested heroin, Retzinger would still expect her pupils to be constricted. Sova's heart rate was slightly elevated, which was also consistent with cocaine intoxication.

¶ 54    The defense rested.

¶ 55    The State called Dr. Stockmal as a rebuttal witness. Stockmal testified that he did not believe that Sova presented with a myocardial infarction. The results of Sova's echocardiogram were normal. Sova had a mild elevation of troponin, but she had no electrocardiogram (ECG) findings of an acute heart attack. The troponin elevation could have been from a hyperdynamic state or stress. Sova's CK levels were "markedly elevated," but "the majority of that was due to rhabdomyolysis." Sova's relative CK index, which was considered when diagnosing a heart

17

attack, was extremely low. A CK index above 2.5 would indicate that a myocardial infarction had occurred, but Sova's CK index was never that high.[5]

¶ 56    Dr. Humilier testified that he disagreed with Retzinger's conclusion that heroin played no role in causing Sova's anoxic encephalopathy. If Sova had a myocardial infarction four days prior to the autopsy, Humilier would have expected her heart to have a mottled look. Humilier's observations of Sova's heart were not consistent with someone who had suffered from a myocardial infarction, and there were no findings in the ER records that were consistent with a myocardial infarction. Humilier did not perform a microscopic examination on Sova's heart because he did not believe it was necessary. The myocardial tissue looked completely normal. Sova's troponin levels were indicative of a minor injury to the heart, but not a myocardial infarction. Humilier stated that "the troponin was indicative of the heart's injury from the cocaine and heroin intoxication along with the brain injury along with the kidney failure."

¶ 57    Humilier did not believe that Retzinger adequately considered the presence of the heroin or the 6-MAM in Sova's system. Humilier stated that "though the value of the morphine is subtherapeutic in a clinical context where you have a physician taking care of a patient, with it being from heroin and not under the administration of a physician, that is a fatal death causing finding." The prosecutor asked Humilier, "And any amount of heroin is enough that can kill a person; is that correct?" Humilier replied, "In that context, yes." Humilier stated that the level of benzoylecgonine in Sova's blood at the time it was tested at the crime laboratory was relatively low.

---

[5]Defendant asserts in his reply brief that the record shows that Sova's CK index was 3.9 on June 29, 2013, at 5 a.m. However, defendant cites to a portion of the transcript where Stockmal was discussing Sova's troponin levels, not her CK index.

18

¶ 58	Humilier testified that the fact that Sova's pupils were dilated did not present a problem for his opinion that she died of a heroin and cocaine overdose. Humilier stated that there were no studies to indicate whether cocaine or heroin would have a dominant effect on the pupils. Sova's brain swelling could have also changed the pupillary response.

¶ 59	Humilier stated that he was asked to discuss the case with the defense attorneys, but he refused. Humilier explained: "[I]n my experience, once the defense counsel has hired an expert their purpose is just to discredit anything I have to say, and I would just be helping them in doing that by giving them ammunition. So I don't do that."

¶ 60	The defense called Dr. Retzinger as a surrebuttal witness. Retzinger stated that "myocardial infarction" was not the terminology he would use for Sova's heart injury. The terms myocardial injury, event, or lesion would be more appropriate. An individual could have a significant heart-related event and a normal ECG. An ECG performed on Sova on June 28, 2013, showed abnormalities, namely, tachycardia and "[n]onspecific ST abnormality." Tachycardia meant that Sova had a fast heart rate. Nonspecific ST abnormality meant that there was damage to the back wall of Sova's heart.

¶ 61	Retzinger testified that troponin was a better indicator of heart injury than CK levels because troponin was only elevated if there was damage to the heart. Retzinger acknowledged that Sova had rhabdomyolysis, but her troponin levels indicated that a large part of her "CK-MB" was coming from the heart. Retzinger opined that it was possible for the heart to appear normal when there is a myocardial insult.

¶ 62	Retzinger disagreed with Humilier's testimony that any amount of heroin could kill a person. Retzinger noted that heroin was a prescription medication in several countries— including Canada, Ireland, and Portugal—and that it was a legalized recreational drug in the

19

Netherlands. Retzinger stated that no government would "knowingly allow [its] citizenry to take a drug that will end up in certain death." Retzinger noted that many people used heroin, and they did not all die. Retzinger stated: "To say that anybody that takes any amount of heroin is going to suffer certain death is ridiculous."

¶ 63         Retzinger did not agree with Humilier's testimony that Sova's level of benzoylecgonine, the major metabolite of cocaine, was relatively low. Sova's level of benzoylecgonine was 630 micrograms per liter, and a toxic level would be above 1000 micrograms per liter. However, the sample was 30 days old at the time it was tested and had not been preserved, so the levels of benzoylecgonine were going down over time. If the blood had been tested when it was first collected, it would have been above the toxic level.

¶ 64         Retzinger opined that the fact that Sova's pupils were dilated indicated that cocaine intoxication was dominant. Sova's initial presentation at the ER was not consistent with heroin overdosage because her pupils were dilated and reactive to light, she did not respond to Narcan, she had a fast heart rate, and she had no pulmonary edema.

¶ 65         After hearing arguments, the court found defendant guilty of unlawful delivery of a controlled substance and drug induced homicide. The court reasoned:

> "As it relates to the delivery count, [defendant], I think your statements arguably there were three different versions of how the delivery occurred in this Court's mind and that in and of itself supported with the presence of the controlled substance of the heroin I believe satisfies all the prongs of the case law. So it is not simply an admission. It is not simply a confession. It is more than that."

20

¶ 66    The court imposed concurrent sentences of 24 years' imprisonment for drug-induced homicide and 11 years' imprisonment for unlawful delivery of a controlled substance. Defendant appeals.

¶ 67                                II. ANALYSIS

¶ 68                         A. Motion to Dismiss Indictments

¶ 69    We first address defendant's argument that the court erred in denying his motion to dismiss the indictments. Defendant argues that (1) the State presented deceptive and inaccurate evidence during the grand jury proceedings, and (2) even if Barten's testimony was not misleading, "the indictments did not satisfy the elements required by the applicable statutes." We address each argument in turn.

¶ 70                             1. Inaccurate Evidence

¶ 71    We first address defendant's argument that the State presented deceptive or inaccurate evidence to the grand juries. "The due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence." *People v. DiVincenzo*, 183 Ill. 2d 239, 257 (1998).

¶ 72    As a threshold matter, the State argues that the record on appeal is insufficient to address defendant's argument that the State presented misleading evidence to the grand juries. We agree. Defendant failed to include the grand jury transcripts in the record, though the record indicates that they were introduced as exhibits at one of the hearings on the motion to dismiss the indictments. Without the grand jury transcripts, it is impossible to determine exactly what Officer Barten testified to in each proceeding and to compare these statements against the evidence that Barten was aware of at the time of the grand jury proceedings. Stated another way,

21

without the transcripts, it is impossible to determine whether Barten's statements to the grand juries were inaccurate.

¶ 73    We acknowledge that Barten indicated during his testimony at one of the hearings on the motion to dismiss that he testified before the first grand jury that defendant had stated that he gave the heroin to Sova after he purchased it. However, without the transcripts of the grand jury proceedings it is impossible to determine the actual wording that Barten used and compare it against defendant's statements during his interviews with the police. We also acknowledge that defendant purported to quote from the grand jury transcripts in his motion to dismiss the indictments, and both parties referenced certain excerpts from the grand jury proceedings during their arguments on defendant's motion. However, without the actual grand jury transcripts, it is impossible to determine whether the parties' representations concerning the grand jury proceedings were accurate or to put the excerpts in context of the entire proceedings.

¶ 74    "An appellant has the burden to present a sufficiently complete record of the proceedings below to support a claim of error." *People v. Fair*, 193 Ill. 2d 256, 264 (2000). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Because we cannot adequately review defendant's claim that the evidence presented to the grand jury was inaccurate or misleading without the actual grand jury transcripts, we assume that the circuit court's order denying the motion to dismiss the indictments was proper. See *Fair*, 193 Ill. 2d at 264 ("In the absence of a complete record on appeal, it will be presumed that the order entered by the circuit court was in conformity with law and had a sufficient factual basis.").

¶ 75    2. Failure of Indictment to Satisfy Applicable Law

22

¶ 76    We now address the second part of defendant's argument—that even if Barten's testimony was not misleading, "the indictments did not satisfy the elements required by the applicable statutes." Under section 114-1(a)(8) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-1(a)(8) (West 2012)), an indictment may be dismissed if "[t]he charge does not state an offense."

¶ 77    However, defendant's argument is not that the allegations in the bills of indictment do not adequately set forth the elements of the offenses of unlawful delivery of a controlled substance and drug-induced homicide. Such an argument would fail. The bill of indictment charging defendant with unlawful delivery of a controlled substance set forth all the elements of the offense—namely, that defendant delivered a controlled substance other than as authorized by the Act. See 720 ILCS 570/401(d)(i) (West 2012). Similarly, the bill of indictment charging defendant with drug induced homicide set forth all the elements of that offense—that defendant "unlawfully deliver[ed] a controlled substance to another, and any person's death [was] caused by the *** ingestion of any amount of that controlled substance." 720 ILCS 5/9-3.3(a) (West 2012).

¶ 78    Instead, the substance of defendant's argument is that the evidence presented at the grand jury proceedings did not support findings of probable cause that defendant committed the charged offenses. Specifically, defendant argues that the evidence presented to the grand juries merely showed that he and Sova jointly and simultaneously acquired the heroin, not that defendant delivered the heroin to Sova. However, "[a] defendant may not seek to challenge the sufficiency of the evidence considered by a grand jury if some evidence was presented." *DiVincenzo*, 183 Ill. 2d at 255. Moreover, "an indictment that is valid on its face may not be dismissed on the ground that the evidence supporting it is inadequate." *People v. Oliver*, 368 Ill.

23

App. 3d 690, 699 (2006). The indictments in this case were facially valid because they adequately set forth all the elements of the charged offenses. It is undisputed that there was some evidence presented to the grand jury—namely, Barten's testimony. Thus, defendant may not seek dismissal of the indictments by attacking the sufficiency of the evidence presented to the grand jury.

¶ 79                               B. Sufficiency of the Evidence

¶ 80        Defendant next argues that the evidence presented at his trial was insufficient to prove him guilty beyond a reasonable doubt of unlawful delivery of a controlled substance or drug-induced homicide. To prove that defendant committed the offense of unlawful delivery of a controlled substance, the State was required to show that defendant knowingly delivered heroin to Sova. See 720 ILCS 570/401 (West 2012). To prove that defendant committed the offense of drug-induced homicide, the State was required to show that defendant (1) unlawfully and knowingly delivered heroin to Sova, and (2) Sova's death was "caused by" the injection, inhalation, absorption, or ingestion of any amount of the heroin. See 720 ILCS 5/9-3.3 (West 2012). Defendant argues that the evidence was insufficient to show that (1) he delivered heroin to Sova, or (2) Sova's death was caused by the ingestion of heroin.

¶ 81        When presented with a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original). *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard of review 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v.*

24

*Brown*, 2013 IL 114196, ¶ 48 (quoting *Jackson*, 443 U.S. at 319). Determinations made by the trier of fact on issues concerning the weight of the evidence and the credibility of the witnesses, while not conclusive, are entitled to deference. *Id.* The reviewing court "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Collins*, 106 Ill. 2d at 261.

¶ 82                                     1. Delivery

¶ 83        We first address defendant's argument that the evidence was insufficient to prove that he knowingly delivered heroin to Sova. " 'Deliver' or 'delivery' means the actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration, whether or not there is an agency relationship." 720 ILCS 570/102(h) (West 2012).

¶ 84        Citing *People v. Coots*, 2012 IL App (2d) 100592, defendant argues that he never delivered heroin to Sova. Defendant contends that he merely jointly possessed the heroin with Sova because the purchase of the heroin was a copurchase by truly equal partners.

¶ 85        In *Coots*, the victim wanted to procure heroin, and he provided money to pay for heroin. *Id.* ¶ 40. The defendant made calls, located a supplier, and ordered the heroin. *Id.* Both the defendant and the victim were present when the heroin was delivered to their hotel room, but the supplier gave the heroin to the defendant. *Id.* The victim ingested one bag of heroin, and the defendant also ingested some of the heroin. *Id.* ¶ 10. The defendant had several more bags in her pocket. *Id.* The victim told the defendant that he was not high, and he begged her for a second bag of heroin. *Id.* The defendant indicated to detectives that she initially intended not to give the victim a second bag. *Id.* ¶ 11. However, the victim continued to beg, and she gave him another

25

bag. *Id.* The defendant explained that the victim had paid for the heroin with his own money. *Id.* The victim eventually died of an overdose. *Id.* ¶ 5.

¶ 86    The *Coots* court discussed the decision in *United States v. Swiderski*, 548 F.2d 445 (2d Cir. 1977) and related authority from federal courts and the courts of other states. *Coots*, 2012 IL App (2d) 100592, ¶¶ 19-34. The court then concluded that the case law it had discussed addressed "two paradigmatic situations." *Id.* ¶ 36. In the first paradigmatic situation, "the defendant and the co-user '*simultaneously and jointly acquire* possession of a drug for their own use, intending only to share it together.' " (Emphasis in original.) *Id.* (quoting *Swiderski*, 548 F.2d at 450). In such a situation, the defendant is guilty of possession but not delivery. This is because "the co-purchasers are, from the outset, in 'joint possession' (in the criminal-law sense) with no intention of distributing the illicit substance to a third party." *Id.*

¶ 87    In the second paradigmatic situation, "the defendant separately procures the drug in the absence of the co-user (and perhaps co-purchaser), then physically transfers possession to the co-user, with no intent to convey any to a third party." *Id.* ¶ 37. In such a situation, the defendant is guilty of delivery. *Id.* The *Coots* court reasoned that "when one person acquires the drug himself, then physically transfers possession to another, he has 'operated as [a] link between the person with whom he intended to share the [drug] and the drug itself.' " *Id.* (quoting *United States v. Wright*, 593 F.2d 105, 108 (9th Cir. 1979)). In that situation, the co-users are not equal partners because the user who acquired the drug has taken a more active role in the transaction. *Id.*

¶ 88    The *Coots* court found that the facts of that case did not fall neatly into either paradigmatic situation and that "the evidence allowed a reasonable jury either to convict or to acquit defendant." *Id.* ¶ 41. The court reasoned that "the resolution of the trial depended on debatable inferences going to the interrelated questions of 'practical control' and joint

26

possession—and thus to the ultimate issue of whether any physical transfer of heroin from defendant to [the victim] was a *delivery*." (Emphasis in original.) *Id.* The *Coots* court reversed and remanded for a new trial on the basis that defense counsel should have requested, and the circuit court should have given, two pattern jury instructions that would have clarified the meaning of the term "deliver." *Id.* ¶¶ 54-56.

¶ 89    Viewing the evidence in the light most favorable to the State, the instant case falls into the second paradigmatic situation discussed in *Coots*. See *id.* ¶ 37. During defendant's interview with Filipiak, defendant indicated that he and Sova rode in her vehicle to purchase heroin from his source, she drove the vehicle, and she provided the money. However, defendant's statements during his interview supported an inference that he alone exited the vehicle and purchased the heroin from his source. He nodded his head, indicating "yes," both when Filipiak asked him if Sova handed him the money and when Filipiak asked if he then "went up" and purchased the heroin from his source. It would have made little sense for Sova to hand defendant money to purchase the heroin if she was with him during the actual purchase. Also, defendant admitted in a text message to Sarah that he "got it" for Sova. Like *Coots*, this was a close case. However, viewing the evidence in the light most favorable to the State, a rational trier of fact could conclude that defendant and Sova did not jointly and simultaneously acquire possession of the heroin, despite the fact that Sova was a co-user and a co-purchaser.

¶ 90    The trial evidence also supported an inference that after defendant obtained the heroin, he transferred possession of some of the heroin to Sova. Defendant told Filipiak that he and Sova both used the heroin at his residence. The next day, defendant found Sova unresponsive, and he took her to the hospital. Subsequent testing on Sova's urine showed the presence of 6-MAM. Dr.

27

Humilier testified that the presence of 6-MAM conclusively showed that there was heroin in Sova's system.

¶ 91    We reject defendant's argument that his conviction for unlawful delivery of a controlled substance violated the *corpus delicti* rule. Generally, the *corpus delicti*, or the commission of a crime, cannot be proven solely by a defendant's admission, confession, or out-of-court statement. *People v. Lara*, 2012 IL 112370, ¶ 17. The State must also present independent corroborating evidence. *Id.*

> "[T]he *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime. The independent evidence need not precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." *Id.* ¶ 51.

¶ 92    Here, there was sufficient corroborating evidence corresponding with the circumstances of defendant's statements to the police and tending to connect him with the crime. Surveillance footage from the gas station showed that defendant met Sova there, as he told the police. An ATM receipt also showed that Sova withdrew $100 that evening, which corroborated defendant's statements that he purchased one hundred dollars' worth of heroin with money provided by Sova. Burd's testimony corroborated defendant's statement that Sova was unresponsive in his residence the next day. Testing on Sova's blood and urine showed that she had ingested heroin, which corroborated defendant's statement that they had used heroin together earlier that morning.

¶ 93                                    2. Causation

28

¶ 94        Defendant next argues that the State failed to prove beyond a reasonable doubt that Sova's death was caused by the ingestion of heroin, which was one of the essential elements of the offense of drug-induced homicide. See 720 ILCS 5/9-3.3 (West 2012).

¶ 95        In *People v. Nere*, 2018 IL 122566, ¶ 42, our supreme court held that the term "caused by" in the drug-induced homicide statute referred to a contributing cause standard, which is the usual standard of causation in Illinois homicide cases. Under the contributing cause standard, "[t]he defendant's act *** need not be the sole or immediate cause of death; rather, it is sufficient if the defendant's act contributed to cause the death." *People v. Brown*, 169 Ill. 2d 132, 152 (1996). In a drug-induced homicide case, the State is required to prove that the ingestion of the controlled substance that the defendant delivered to the victim was a contributing cause of the victim's death. See *Nere*, 2018 IL 122566, ¶ 71.

¶ 96        Here, the trial evidence, viewed in the light most favorable to the State, shows that the ingestion of heroin was a contributing cause of Sova's death. Dr. Humilier testified that Sova's death was caused by heroin and cocaine intoxication. Humilier stated that both the heroin and cocaine contributed to Sova's death and that the presence of both the heroin and cocaine caused Sova's death. In reaching his conclusion, Humilier acknowledged that there was a therapeutic level of morphine in Sova's blood. Though Humilier could not say that heroin alone caused Sova's death, he opined that any amount of heroin could be "a problem" or even lethal. Humilier noted that heroin was not administered under the supervision of physicians. Based on Humilier's expert opinion, a rational trier of fact could have concluded that heroin intoxication was a contributing cause of Sova's death.

¶ 97        We acknowledge that Dr. Retzinger opined that Sova's death was solely due to cocaine intoxication and that heroin intoxication had nothing to do with her death. However, Retzinger's

29

testimony that Sova had suffered a heart-related event due to cocaine intoxication was partially contradicted by the testimony of Humilier and Dr. Stockmal. Neither Humilier nor Stockmal agreed with Retzinger that Sova's dilated pupils necessarily meant she was suffering from cocaine intoxication. Also, Stockmal testified that Sova's ECG results were normal, the mild elevation of her troponin levels could have been due to a hyperdynamic state or stress, and her CK index was low. Humilier testified that Sova's heart did not have a mottled look, her myocardial tissue appeared normal, and her troponin levels were not indicative of a myocardial infarction.

¶ 98        Contrary to Retzinger's testimony that the level of benzoylecgonine in Sova's blood indicated that she would have had a lethal amount of cocaine her system on the morning of June 28, 2013, Humilier testified that the level of benzoylecgonine in Sova's blood was relatively low. Humilier disagreed with Retzinger's opinion that the level of morphine in Sova's system was so low that the ingestion of heroin could not have contributed to her death. Humilier noted that unlike morphine administered in a hospital, heroin was not administered under the supervision of a physician and any amount could be lethal. Humilier's testimony on this point was partially corroborated by Isenschmid's testimony that, for some individuals, a toxic amount of morphine could be as low as 20 nanograms per milliliter.

¶ 99        The varying opinions of Stockmal, Humilier, and Retzinger presented the circuit court with conflicting evidence. It was the province of the circuit court to weigh the credibility of these witnesses and to resolve conflicts in their testimony. See *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). It was not unreasonable for the court to accept the testimony of Humilier and Stockmal over that of Retzinger, and we will not substitute our judgment for that of the trier of fact on these matters. See *id.*

30

¶ 100    We reject defendant's argument that the circuit court erred in finding Humilier's testimony to be credible. Defendant extensively argues that Humilier's conclusion that heroin intoxication contributed to Sova's death came only after the testing at NMS Laboratories, which defendant claims was unreliable. Specifically, defendant argues:

> "It should have been suspicious, if not obvious, that Dr. Humilier originally could not conclude that heroin was a contributing cause of Sova's death, but just when the trial was about to begin years later and test results of 'goop' represented a significantly higher level of morphine was in Sova's body, he amended his opinion."

¶ 101    Defendant's argument is unavailing, and it misrepresents the record. First, there was no evidence that the blood tested by NMS Laboratories was "goop." Isenschmid testified that he expressed concerns that such an old sample could be "goopy," but stated that he was not describing the sample he actually received as "goop." Moreover, nothing in Humilier's testimony supports defendant's assertion that Humilier only concluded that heroin contributed to Sova's death after the results from NMS Laboratories revealed a higher concentration of morphine than the initial testing. In fact, Humilier explicitly stated on cross-examination that his initial opinion based on the testing at the crime laboratory was that Sova's cause of death was heroin and cocaine intoxication. Humilier explained that the initial testing was only for cocaine and opiates, so he used the term "combined drug intoxication" in order to "cover anything else that may have been missed by that testing." The purpose of the testing at NMS Laboratories was to determine if other substances may have also contributed to Sova's death.

¶ 102    Defendant notes that the testing performed by NMS Laboratories detected additional drugs in Sova's system. Defendant argues that it is "curious" that Humilier claimed to have

ordered testing from NMS Laboratories to determine whether more drugs were present in Sova's system but failed to explain what effect the additional drugs had on the basis of his amended conclusion. Humilier was not asked directly about the presence of the additional drugs. However, Humilier indicated that the testing at NMS Laboratories "ruled out the presence of other substances to the extent that it could with the date of the sample so that we could focus the cause of death as being strictly heroin and cocaine intoxication." Thus, the trier of fact could reasonably infer that Humilier did not believe that the additional drugs that were detected contributed to Sova's death.

¶ 103    Notably, the only additional drugs found by NMS Laboratories were diphenhydramine (or Benadryl), caffeine, cotinine (a nicotine metabolite), and MEGX. Isenschmid testified that MEGX came from lidocaine, which was used in hospitals and as a cutting agent with cocaine, heroin, and other drugs. The MEGX finding was an incidental finding. Isenschmid also testified that a very small amount of butalbital was detected, but it was below the reporting limits. It is not apparent that any of these substances would have contributed to Sova's death.

¶ 104    We also reject defendant's argument that Humilier was not credible because he offered contradictory testimony. Specifically, defendant argues that Humilier initially testified that he could not say that heroin was a "but-for" cause of Sova's death, but later testified, in defendant's characterization, "that any amount of heroin is lethal, establishing heroin as a 'but-for' cause." However, Humilier's actual testimony was that any amount of heroin *can* kill a person; he did not testify that any amount of heroin was necessarily lethal. This was not contradictory with his testimony that he could not say in this particular instance that Sova would not have died had it not been for the heroin. We note that after Humilier testified that he could not say that heroin

was a "but-for" cause of Sova's death, he clarified that Sova's death was caused by both the heroin and cocaine in her system.

¶ 105    We disagree with defendant's assertion that Humilier's testimony that he relied on the representations of the chief deputy coroner that there were no other specimens available for testing was unbelievable. In his brief, defendant asserts: "Common sense dictates that any hospital in America would draw more than one vial of blood/urine, especially with the possibility that the cause of death was from overdose. An experienced coroner, Dr. Humilier would have known this." Defendant's assertion is completely speculative. Humilier's reliance on the chief deputy coroner's representations that no other specimens were available did not render his testimony incredible.

¶ 106    We also reject defendant's argument that Humilier was not a credible witness because he refused to discuss his findings with the defense. Humilier explained that he did not want to talk to the defense because he believed, based on experience, that the defense expert would attempt to discredit everything that he said. This did not render his testimony unworthy of belief.

¶ 107    C. Admission of Burd's Testimony Concerning Other Crimes

¶ 108    Defendant argues that the circuit court abused its discretion in permitting Burd to testify that defendant had delivered heroin to him in the past. Defendant argues that "[u]nder the unique facts of this case, it appears the court considered Burd's testimony regarding the prior bad acts to establish Defendant's propensity to commit crime." Defendant notes that the State argued that the other-crimes evidence was relevant to show intent and absence of mistake due to defendant's familiarity with heroin. Defendant argues that these matters were not at issue and that the other-crimes evidence should not have been admitted for these purposes. Defendant also argues that,

33

even assuming the evidence was admissible, its probative value was substantially outweighed by the danger of unfair prejudice.

¶ 109     Other-crimes evidence is admissible if it is relevant for any purpose other than the defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Examples of proper purposes for the admission of other-crimes evidence include showing *modus operandi*, intent, identity, motive, or absence of mistake. *Id.* at 136. The circuit court's decision to admit other-crimes evidence will not be disturbed absent an abuse of discretion. *Id.*

¶ 110     Initially, we reject defendant's argument that the court improperly considered Burd's testimony concerning defendant's prior deliveries of heroin as evidence of defendant's propensity to commit crimes. This testimony was admitted to show defendant's intent to deliver heroin, and nothing in the record indicates that the circuit court considered it for any other purpose. Accordingly, we presume that the court only considered this evidence for the limited purpose for which it was introduced. See *People v. Deenadayalu*, 331 Ill. App. 3d 442, 450 (2002).

¶ 111     Even if we were to accept defendant's argument that the court abused its discretion in admitting the other-crimes evidence for the purpose of showing defendant's intent to deliver heroin on the basis that this was not at issue, we agree with the State that any error was harmless. "[T]he improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). "Although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different. If it is unlikely that the error influenced the jury, reversal is not warranted." *People v. Hall*, 194 Ill. 2d 305, 339 (2000).

34

Unlike *Hall*, this case involved a bench trial rather than a jury trial, and the court set forth its reasoning for the verdict on the record. Accordingly, we have even more information than in a jury trial concerning what evidence influenced the court's verdict.

¶ 112　　　　Here, evidence that defendant delivered heroin to Sova was introduced through defendant's statement to the police that he "went up" and purchased heroin from his source with Sova's money and that they later used the heroin together. The fact that heroin was found in Sova's blood and urine was circumstantial evidence that defendant transferred possession of some of the heroin to her at some point. Defendant's text messages to Sarah, viewed in the light most favorable to the State, also supported an inference that he transferred possession of the heroin to Sova. The circuit court expressly indicated that it had found that the State had proven delivery based on defendant's statements and the presence of the heroin in Sova's system. The court did not indicate that Burd's testimony affected its determination as to delivery. Under these circumstances, it is unlikely that the admission of Burd's testimony influenced the circuit court's verdict. See *Hall*, 194 Ill. 2d at 339.

¶ 113　　　　　　　　　　　　　　III. CONCLUSION

¶ 114　　　　The judgment of the circuit court of Will County is affirmed.

¶ 115　　　　Affirmed.